Maurice M. SAYRE, Trustee in Bankruptcy of the Liberty Mortgage Corporation, Plaintiff,

v.

The UNITED STATES of America and the City of Cleveland, Defendants.

Civ. A. C 66–788.

United States District Court
N. D. Ohio, E. D.

Nov. 17, 1967.

Edwin F. Woodle, Cleveland, Ohio, for plaintiff.

Merle M. McCurdy, U. S. Atty., Dominic J. Cimino, Asst. U. S. Atty., Robert Eliot Easton, Dept. of Justice, Washington, D. C., for the United States of America.

Bronis J. Klementowicz, Law Director, Richard J. Marco, James P. Mancino, Asst. Law Directors, Cleveland, Ohio, for City of Cleveland.

### MEMORANDUM

WILLIAM K. THOMAS, District Judge.

Maurice M. Sayre, trustee in bankruptcy of the Liberty Mortgage Corporation, sues the United States of America and the City of Cleveland for $10,000,000 in damages for loss of income, earnings and property of the plaintiff's bankrupt. As a cause of the losses it is claimed that the defendants acted negligently in the conduct of the University-Euclid Urban Renewal Area Project (which plaintiff sometimes designates as the Hough area project); and it is claimed also that acts and omissions of the defendants in carrying out this urban renewal project constituted a taking of the bankrupt's properties without just compensation in violation of the fourteenth and fifth amendments of the United States Constitution.

Defendant City of Cleveland moves to dismiss the plaintiff's complaint filed November 11, 1966, and his supplement to the complaint filed March 24, 1967. Defendant United States of America moves for summary judgment. Defendant

City's motion to dismiss will be first considered.

Defendant City of Cleveland urges that the complaint fails to state a claim against the defendant City of Cleveland within the jurisdiction of this court. It is further urged that the complaint does not allege facts sufficient to constitute a claim upon which relief may be granted against defendant City of Cleveland.

The original complaint includes these statements and claims. Plaintiff's bankrupt, Liberty Mortgage Corporation, an Ohio corporation, owned, managed, and operated residential properties in Cleveland in 1961 and prior years. A substantial number of the properties owned by the bankrupt were in the Hough project area.

In accordance with the Housing Act of 1949 the United States Government made available many millions of dollars for the purpose of aiding municipalities in the intended physical improvement of large areas of such municipalities. A federal urban renewal administration was established to administer and supervise the distribution and use of the federal funds.

The City Planning Commission of Cleveland on January 27, 1961 adopted the University-Euclid General Neighborhood Renewal Plan. On June 14, 1961 the Cleveland City Council enacted Ordinance No. 1338–61, declaring the area incorporated in said project to be a slum, blighted, deteriorated, and deteriorating area of the City of Cleveland; and the ordinance stated that it "was necessary for the health and welfare of the residents of the defendant City." The University-Euclid Urban Renewal Plan, designated as Project No. 1 Ohio R–44 comprises approximately 488 acres of land east of East 105th Street on the east side of Cleveland and about the same number of acres lying to the west of East 105th Street.

It is stated that the University-Euclid plan, adopted by the City of Cleveland and approved and supervised by the United States, contemplated the acquisition by the City of Cleveland of a large number of residences, including many of the properties of the Liberty Mortgage Corporation. Said properties were intended to be acquired by negotiation and voluntary sale if possible, and if not possible then by proceedings instituted in the courts for appropriation of such properties by virtue of the exercise by the City of Cleveland of its power of eminent domain.

Plaintiff alleges that the defendants knew and were fully aware:

that if, by their conduct, they should cause properties to be, and to become and to remain, vacant and unoccupied, that in all probability such unoccupied properties would be promptly and thoroughly vandalized and destroyed.

It is alleged:

By reason of the careless and negligent manner in which said Hough area project was carried out, a large number of properties owned by this plaintiff's bankrupt, and previously occupied and previously producing substantial income, were caused to be vacated and abandoned, and were caused to remain vacated and abandoned, and were caused to be vandalized and destroyed.

It is stated that on July 14, 1961 the defendant City commenced the execution of the Hough project. In furtherance thereof:

said defendant forthwith sent, or caused to be sent, to hundreds of residents and occupants of the project area, including scores of residents and occupants of properties owned by the plaintiff's bankrupt herein, notices to the effect that the defendant City intended to acquire said properties.

It is said that:

said notices were sent out carelessly, hastily and without regard for the rights of the owners of said properties, including plaintiff's bankrupt, and without any regard whatsoever for the actual time at which the defendant City proposed or intended, or in fact took, any action whatsoever for the

purpose of, acquiring or even negotiating to acquire the properties occupied by such persons. The sending of such notices under such circumstances constituted a grossly careless and negligent act.

The complaint continues that:

compounding the effect of the careless and negligent conduct of the defendant City set forth * * * said defendant promptly caused to be made prominent and frequent public announcements and publication through all local media of public communication of its intention to appropriate the properties above referred to within the Hough project area, and of its intention to cause the occupants thereof to be removed therefrom, stating to the public generally that such properties were the subject of imminent governmental action in the form of appropriation and rehabilitation by the defendants.

It is further said that:

the defendants proceeded in a careless, inadequate and incompetent manner to acquire in hit and miss fashion small numbers of properties to whose occupants such notices had been sent.

Following up this point it is contended that:

The conduct of the defendants * * * had a fatal and devastating effect upon the business of plaintiff's bankrupt. Although said bankrupt, at the time of the adoption of the Hough area project and up until the date of bankruptcy, was the owner of scores of properties within the project area, dozens of which the defendant City indicated its intention to appropriate, nevertheless at the time the Liberty Mortgage Company was declared bankrupt on the 2nd day of November, 1964 * * * the *defendant City had taken steps to acquire not more than twelve* of said properties and had completed acquisition of not more than one or two of them.

Another claim relates to the defendant City's alleged refusals to permit repairs. It is recited that:

plaintiff's bankrupt made numerous attempts from time of the adoption and approval of the Hough area plan until the determination of bankruptcy to maintain, to repair and to improve the properties owned by plaintiff's bankrupt in the Hough project area which had not been so thoroughly vandalized as a result of the defendant's described conduct as to be impossible of maintenance.

However, it is claimed that:

in many instances, the defendant City refused applications made by said bankrupt to repair and to improve said properties * * * [and that] * * the defendant, by such refusal, caused these properties to be further, and in a number of instances entirely, deteriorated.

The complaint charges both defendants with lack of cooperation in the execution of the Hough area project, with failure to maintain streets, sidewalks, disposal of garbage and rubbish, removal of accumulated and deposited litter and debris, adequate and sufficient health, safety, and sanitation of the residents of the project area. It is said that the defendants caused and permitted said project area to remain without adequate and sufficient police protection; and that this negligent conduct directly and proximately caused and contributed to cause vandalism of plaintiff's bankrupt's property within the project area.

Finally, the complaint states that by reason of the defendants' conduct the plaintiff's bankrupt was prevented from and unable to maintain in repair and in good condition its properties within the Hough project area and was deprived of thousands of dollars of income from the properties within the project area, was caused to lose by vandalism, destruction, and decay, a large number of properties in said area, and, resulting directly and proximately from defendants' conduct, was forced into bankruptcy. It is claimed that plaintiff's bankrupt was deprived of all of its assets, of maintaining its income and in fact entirely prevented

from earning any income whatsoever, that if said event had not been caused to occur, said bankrupt would have continued to earn hundreds of thousands of dollars annually thereafter as it had earned prior to said bankruptcy, and plaintiff's bankrupt has been damaged in the amount of $10,000,000.

The nature and effect of the supplement to complaint will be considered later.

Plaintiff's original complaint, its fifteen pages here extracted and condensed, undertakes to frame a claim in negligence against the defendant City of Cleveland. It is charged that the sufficiency of the complaint fails. Defendant City urges that the establishment and execution of an urban renewal program even if negligently carried on is a governmental function not actionable under Ohio's rule of sovereign immunity.

Plaintiff, on the contrary, emphasizes that there was no obligation on the part of the City of Cleveland to undertake the University-Euclid Urban Renewal Project. With the City voluntarily electing to undertake this project, plaintiff argues that the City's conduct of the project is "private and proprietary." Plaintiff insists that the applicable test is declared in City of Wooster v. Arbenz, 116 Ohio St. 281, at 284, 156 N.E. 210, at 211–212, 52 A.L.R. 518 (1927) when it states:

> If * * * there is no obligation on the part of the municipality to perform them, but it does in fact do so for the comfort and convenience of its citizens, for which the city is directly compensated by levying assessments upon property, or where it is indirectly benefited by growth and prosperity of the city and its inhabitants, and the city has an election whether to do or omit to do those acts, the function is private and proprietary.

In Corbean v. Xenia City Board of Education, 366 F.2d 480 (6th Cir. 1966), the United States Court of Appeals for the Sixth Circuit recognizes Ohio's adherence to the doctrine of sovereign immunity. The doctrine persists, see Gabaris v. Blake, 9 Ohio St.2d 71, 223 N.E.2d 597 (1967). Chief Justice Marshall's test of the "private and proprietary" function, quoted from *Arbenz,* supra, however seems to be honored more in the breach than in the observance. In the recent case of Hyde v. City of Lakewood, 2 Ohio St.2d 155, 207 N.E.2d 547 (1965) the operation of Lakewood City Hospital, though entirely voluntary on the part of the City of Lakewood, was found under the facts of that case to be a governmental function.

■ Just because Cleveland voluntarily elected to contract with the Federal Government to undertake an urban renewal project cannot serve to make that project a "private and proprietary function." If that were so every federal aid program voluntarily undertaken by state, county, or municipal governments—interstate highway systems, county welfare programs, local anti-poverty programs, to cite some better known examples—by the alchemy of the *Arbenz* test ("and the city has an election whether to do or omit to do those acts") would be transformed from a government to a proprietary function. The *Arbenz* test of whether a municipal function is governmental or proprietary is undependable and outdated. It is here found to be inapplicable.

Ohio recognizes slum and blight clearance and prevention as a public purpose. State ex rel. Bruestle v. Rich, 159 Ohio St. 13, 110 N.E.2d 778, Syl. 1 (1952), holds that where an urban redevelopment project has as its primary purpose the elimination of slum conditions and prevention against their recurrence, "such project may involve a public use or purpose for which public funds can be expended and the power of eminent domain exercised."

■ In view of the purposes of the University-Euclid Urban Renewal Plan, deemed by Cleveland City Council to be "necessary for the health and welfare of the residents of Cleveland," and in view of *Bruestle's,* supra, apt holding

that an urban renewal project involves a public purpose, the University-Euclid Urban Renewal Area Project is found and determined to be a governmental function. In reaching this conclusion this court follows the Ohio rule, as expressed in *Hyde,* supra, that "whether the performance of various activities by a municipality is governmental or proprietary frequently depends on the peculiar facts of the particular case."

■ As a governmental function, the establishment and execution of University-Euclid Urban Renewal Project cannot give rise to an action in negligence. Hence, as a claim of negligence based on the careless operation of the project, plaintiff's complaint does not and cannot state a cause of action against defendant City of Cleveland.

■ Yet even if it were assumed that plaintiff's complaint does state a cause of action in negligence against defendant City of Cleveland, no federal jurisdiction exists to hear and to determine such a claim. Both the plaintiff's bankrupt, Liberty Mortgage Corporation, and the City of Cleveland are Ohio corporations. Hence there is no diversity of citizenship between these parties to give this court jurisdiction under Title 28, U.S.C. § 1332 (1964).

■ The joinder of the defendant United States of America as a co-defendant, charged as a tort feasor under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1964) cannot collaterally bestow federal jurisdiction on a negligence claim against the defendant City of Cleveland. It is nevertheless essential that there be diversity of citizenship or other basis for federal jurisdiction of plaintiff or his bankrupt's suit against the defendant City of Cleveland in federal court. See Benbow v. Wolf, 217 F. 2d 203 (9th Cir. 1954); Bullock v. United States, 72 F.Supp. 445 (D.N.J.1947); Sykes v. United States, 290 F.2d 555 (9th Cir. 1961); and 3 Moore, Federal Practice, § 20.07 (2d ed. 1966).

■ Nor does the plaintiff's status as a trustee in bankruptcy supply the miss-ing federal jurisdiction. Only if his bankrupt could have brought suit in a federal district court on a negligence cause of action against the city would the bankrupt's trustee be permitted to sue in a federal district court. See Title 11 U.S.C. § 46(b) (1964) as interpreted in Whitman v. Chicago & N. W. Ry., 70 F.Supp. 9 (D.Minn.1947).

■ Were defendant City's motion to dismiss directed only to the negligence claims of the original complaint, the foregoing conclusions would require the dismissal of the complaint. The motion of defendant City of Cleveland, however, must be judged on the original complaint as amended by the supplement to the complaint. Not a supplemental pleading as defined by Rule 15(d), Fed.R.Civ.P., the supplement will be treated as an amendment to the complaint. The supplement to complaint first amends paragraph 1 of the complaint by stating:

In addition, jurisdiction of this Court in the within action is also conferred by the provisions of the Fifth Amendment and the provisions of the Fourteenth Amendment to the Constitution of the United States.

The supplement then adds numbered paragraphs 32, 33, and 34. Paragraph 32 recites:

32. At all times referred to in this Complaint, the laws of the State of Ohio contain numerous provisions for procedure to be followed by the defendant The City of Cleveland for the appropriation by said defendant of real property under the urban renewal plan referred to in this Complaint. Among said steps were the announcement of the proposed plan to be public, the adoption of the plan by the Council of the defendant City, after a public hearing; and thereafter the furnishing by the defendant City of notices directed to the owners and occupants of specific real property indicating the intention of the defendant City to acquire such real property either by negotiation or by means of appropriate legal action. As heretofore set forth, the defendant

City undertook to notify the plaintiff's bankrupt of its intention to appropriate numerous parcels of real property within the Hough urban renewal area, pursuant to the plan adopted by said defendant. At the same time, said defendant undertook to notify the occupants of said premises owned by the plaintiff's bankrupt. This action on the part of the defendant City, carried out in the manner hereinbefore described, constituted the initial steps in the appropriation of the property of plaintiff's bankrupt, which appropriation the defendant City never carried to completion and which said defendant at no time had the facilities or the ability to consummate.

Paragraph 1 of the complaint as amended states that jurisdiction in the within action is "conferred by the provisions of the Fifth Amendment and the Fourteenth Amendment to the Constitution of the United States." Paragraph 33, added by the supplement to complaint, states in part that the:

> conduct of the defendant City heretofore described in this complaint, and described in particular in paragraph 32, constituted a pro tanto taking and appropriation of the property of plaintiff's bankrupt, with all of the consequences heretofore described, for which taking no compensation whatsoever has been or will be offered.

In passing on the question of whether there is federal jurisdiction to hear the amended complaint, a point of beginning is Chicago, B. & O. R. R. v. City of Chicago, 166 U.S. 226, at 241, 17 S.Ct. 581, at 586, 41 L.Ed. 979 (1897). There the Supreme Court held that a state eminent domain proceeding:

> whereby private property is taken for the State or under its direction for public use, without compensation made or secured to the owner, is, upon principle and authority wanting in the due process of law required by the Fourteenth Amendment of the Constitution of the United States * * *.

Malloy v. Hogan, 378 U.S. 1, at 4, 84 S.Ct. 1489, at 1491, 12 L.Ed.2d 653 (1964) construed Chicago, B. & Q. v. Chicago, supra, to hold that:

> the Due Process Clause requires the States to pay just compensation for private property taken for public use.

Thus, the Supreme Court determines that the due process clause of the fourteenth amendment is the equivalent of the fifth amendment provision "nor shall private property be taken for public use, without just compensation."

Bearing directly on the present question of federal jurisdiction, Foster v. Herley, 330 F.2d 87 (6th Cir. 1964) involved the question of whether federal jurisdiction exists to hear and determine an amended complaint. There the amended complaint alleged that:

> [T]he City, in causing and permitting the threat of condemnation to hang over the plaintiff's property, and the foregoing actions of the City over a period of ten years, was an abuse of the power of eminent domain, deprived the plaintiff of the full use and benefit and the right to ownership of the property, amounted to a taking or damaging of his property without due process of law and in violation of his rights under the Fourteenth Amendment to the Constitution of the United States. Foster v. Herley, supra, 330 F.2d at 89.

Reversing a dismissal of the complaint and ordering the case to be tried on the merits, the Court of Appeals for the Sixth Circuit held:

> The plaintiff claims a right under the Fourteenth Amendment to the United States Constitution not to be deprived of his property without due process of law and that the acts of the defendant constituted such a deprivation. If the Fourteenth Amendment is so construed, it supports his claim. If it is not so construed, his claim is defeated. The District Court had jurisdiction under Section 1331, Title 28 United States Code, to decide this question. [citations] Foster v. Herley, supra at 91.

Under Foster v. Herley, supra, it is the law of this circuit that a municipality's claimed abuse in its exercise of the power of eminent domain, with the claimed result of taking private property without just compensation, presents a question of federal jurisdiction under the fourteenth amendment which a federal district court must hear and determine. Plaintiff's amended complaint in charging the defendant City with conduct which tends to state an abuse in the exercise of the power of eminent domain presents a federal jurisdictional question under the fourteenth amendment as interpreted in Foster v. Herley, supra.

It remains to determine whether the amended complaint, which seeks to charge abuse in the exercise of the power of eminent domain, states a cause of action against defendant City of Cleveland. Plaintiff's counsel observes that "the amendment to the complaint in this cause was specifically framed to bring this action within the purview of those two controlling decisions" (*Foster* cases). The decision on remand of Foster v. Herley, supra, to the United States District Court for the Eastern District of Michigan, Southern Division, therefore should now be viewed. It was tried under the caption Thomas E. Foster and Georgia Lee Foster, plaintiffs v. City of Detroit, defendant, reported at 254 F.Supp. 655 (E.D.Mich.1966) appeal docketed, Nos. 17840, 17843, 6th Cir., July, 1966. District Judge Kaess' findings and conclusions are summarized in the fourth headnote:

> 4. Eminent Domain. A taking of property occurred and payment of just compensation was required, where City of Detroit selected older area for slum clearance and public housing, commenced condemnation proceedings in 1950, substantially contributed to an aggravated deterioration and decline in property values in area by discouraging improvements by actually completing condemnation and clearance of several blocks in area, by requiring razing of many vandalized buildings and by keeping lis pendens

in effect for five years after stop order on project, and abandoned condemnation proceedings in 1960 and thereafter commenced new proceedings.

The district court's decision relies on In re Urban Renewal Elmwood Park Project (City of Detroit v. Cassese), 376 Mich. 311, 136 N.W.2d 896 (Mich.Sup. Ct. 1965) and City of Cleveland v. Carcione, 118 Ohio App. 525, 190 N.E.2d 52 (1963). Judge Kaess describes *Cassese* as "a case arising out of the same factual situation." The Michigan Supreme Court in *Cassese*, supra, 136 N.W.2d at 900, reaches conclusions which have present pertinence. Referring to previously cited cases the *Cassese* opinion declares:

> The principle is firmly established in Michigan law by Pearsall, Ranson, Grand Trunk and Long, supra, that a city may not by deliberate acts reduce the value of private property and thereby deprive the owner of just compensation. Some of the acts charged against the City of Detroit, such as lax police protection, reduction in refuse collections, street cleaning and street repair, go merely to the performance of city services of a general nature. The issue of satisfactory performance of such services would not be relevant in the absence of proof of calculated action or specific directives by city officials for the purpose of reducing the value of appellant's properties. On the other hand, many of the acts alleged by appellant, if so performed,—such as sending letters to tenants, filing lis pendens, intense building department inspection and citations against owners for any violations of the building code, and, finally, refusal to permit a long established business to continue in a building because it was going to be condemned—would fall within the same category as the acts in Pearsall, Ranson, Grand Trunk and Long, supra, and would constitute a taking.

*Cassese* recognizes that "a city may not by deliberate acts reduce the value of

private property and thereby deprive the owner of just compensation." Detroit's completion of the eminent domain proceedings, deliberately done, indisputably constituted an intentional taking of the owner's property. The question on review concerned the timing of the taking. In accordance with the trial court's instructions the jury fixed the value of the take at the time of trial. The Michigan Supreme Court reversed. It determined that assessment of just compensation should reflect the value of the property at an earlier date before the value was allegedly depreciated by the City of Detroit sending "letters to tenants, occupants, [etc.] causing them to move; creating vacancies * * *," and performing the listed acts. These various acts of the city "would constitute a taking," it was held.

In the *Foster*, supra, trial in the United States District Court it was apparently accepted that the state court proceedings appropriating the subject property were final. The *Foster* decision, supra, like *Cassese*, supra, found that the property was taken by the City of Detroit at an earlier date by reason of the City's prior acts. In *Foster*, supra, Judge Kaess, to insure just compensation, fixed the value of the take at the earlier date and awarded the difference between that value and the amount already granted in the state appropriation case.

The complaint's claims that in the Hough area the City of Cleveland provided inadequate police protection, inadequate and insufficient garbage and rubbish removal, inadequate street and sidewalk maintenance would not constitute claims of taking of the properties of plaintiff's bankrupt, under the authority of *Cassese*, supra, in the absence of additional claims that the city officials took "calculated action" to reduce the value of the properties.

Other acts of the City of Detroit found in *Cassese*, supra, and *Foster*, supra, to constitute a taking of property, are similarly claimed by the plaintiff to have been performed by the defendant City of Cleveland. Thus in the original complaint plaintiff alleges that the City "sent notices to residents and occupants of properties owned by plaintiff's bankrupt," and that the defendant City "caused to be made prominent and frequent public announcements * * * of its intention to appropriate the properties * * * and of its intention to cause the occupants thereof to be removed therefrom." Plaintiff also claims that "in many instances, the defendant City refused applications made by said bankrupt to repair and to improve said properties."

In Paragraph 32 of the amended complaint (original complaint amended by the supplement) the plaintiff reiterates the acts of defendant City (particularly the notices indicating the intention of defendant City to acquire such real property). It is said that "this action on the part of the defendant City * * * constituted the initial steps in the appropriation of the property of plaintiff's bankrupt, which appropriation the defendant never carried to completion and which said defendant at no time had the facilities or the ability to consummate." The first paragraph of numbered Paragraph 33 alleges that:

> The conduct of the defendant City heretofore described in this Complaint, and described in particular in paragraph 32, constituted a pro tanto taking and appropriation of the property of plaintiff's bankrupt, with all the consequences heretofore described, for which taking no compensation whatsoever has been or will be offered.

The amended complaint states that Cleveland initiated steps to appropriate properties of plaintiff's bankrupt. These steps are identical to some of Detroit's acts which *Cassese*, supra, and *Foster*, supra, found constituted a taking of property under similar circumstances. In the present case, as in those cases, the doing of these acts by the municipality purportedly caused tenants and occupants to leave properties, caused properties to become vacant and non-income producing, and finally resulted in destruction of the properties by vandals. No physical in-

vasion of the properties by the defendant City is claimed. Yet without being absolutely taken, a taking of property may occur "if the action by the government involves a direct interference with or disturbance of property rights." See R. J. Widen Co. v. United States, 357 F.2d 988, 174 Ct.Cl. 1020 (1966).

 Nevertheless, a government's intention to take property is deemed essential to constitute a taking of private property. In construing and applying the requirement of the fifth amendment that private property shall not be taken for public use without just compensation (equally applicable to the due process clause of the fourteenth amendment) the Court of Claims holds, as reaffirmed in Biggs Rental Co. v. United States, 353 F.2d 1013, at 1017, 173 Ct.Cl. 789 (1965):

> To constitute a taking there must be an intent on the part of the United States to take plaintiff's properties, or, at least an intention to do an act the natural consequences of which was to take property.

In the present case eminent domain proceedings involving the properties of plaintiff's bankrupt, though apparently commenced in accordance with law, have never been accomplished. Hence, Cleveland's intention to take one or more of the subject properties cannot be established, as in Cassese, supra, and Foster, supra, by the fact of completion of the appropriation proceedings. Yet, as seen, Biggs Rental Company, supra, holds that an intentional taking of property occurs if the government intentionally does an act "the natural consequence of which was to take property." Applying Biggs, supra, Cleveland's intent to take the properties of plaintiff's bankrupt is sufficiently charged when plaintiff's amended complaint states in Paragraphs 16 and 18:

> At the time of the adoption and approval of the Hough area project, both defendants knew and were fully aware of the fact that as soon as the nature and extent of the Hough area plan would be made known to the resi-dents of the area, and in particular to the residents and occupants of property to be acquired by the defendant, the City of Cleveland, said residents and occupants, in large numbers, would immediately remove from and abandon the properties occupied by them.

> Said defendants further knew and were fully aware of the fact that if, by their conduct, they should cause properties to be, and to become and to remain, vacant and unoccupied, that in all probability such unoccupied properties would be promptly and thoroughly vandalized and destroyed * * *.

The element of causation is also essential to a claim of abuse of the eminent domain proceedings constituting a taking of property without just compensation. Thus, in Foster, supra, 254 F.Supp. at 662, Judge Kaess found with reference to the conduct of the eminent domain proceedings by the defendant City of Detroit, "that the protracted delay and the actions of the defendant, if they were not the only causes, substantially contributed to, hastened and aggravated the deterioration and decline in value of the area in general and of plaintiff's property in particular."

 An abuse of the exercise of the power of eminent domain would constitute a taking of property without just compensation if that abuse directly and proximately contributes to, hastens, and aggravates, acting alone or in combination with other causes, the deterioration and decline in value of the area and the subject property. On the other hand, an abuse in the exercise of the power of eminent domain would not constitute a taking of property without just compensation if substantially the same depreciation in the value of the area and of the subject property would have occurred irrespective of initiation of or delay in the appropriation proceedings. Or, put another way, if the neighborhood decay which justified the inception of the urban renewal project, or progression of that same decay would have caused substantially the same decline in value of the

area and of the subject property, in the absence of any appropriation proceedings, a taking of the property without just compensation did not occur.

██ Plaintiff's original complaint attributes the vacating, abandonment, vandalizing, and destruction of properties owned by the plaintiff's bankrupt to "the careless and negligent manner in which said Hough area project was carried out." The supplement to complaint, on the other hand, broadly says "the conduct of the defendant City * * * constituted a pro tanto taking and appropriation of the property of plaintiff's bankrupt," and later it says "plaintiff is entitled to a determination of the damages caused to plaintiff's bankrupt and the loss of property caused to plaintiff's bankrupt by said conduct." Considering the contentions of causation in the light most favorable to the plaintiff the element of causation is sufficiently pleaded.

The intertwined claims of negligence, already held legally insufficient as against the City, are therefore treated as superfluous and ineffective.

Plaintiff alleges in Paragraph 33 of his amended complaint as follows:

The laws of the State of Ohio provide no procedure by virtue of which plaintiff's bankrupt could or can secure from the defendant City compensation for the taking of its property in the manner herein described. Moreover, the Supreme Court of the State of Ohio has so interpreted and applied within that state the guarantee set forth in the Fifth Amendment to the Constitution of the United States forbidding the taking of private property for public use without payment of just compensation therefor, which guarantee affords protection to the plaintiff's bankrupt by virtue of the provisions of the Fourteenth Amendment to the Constitution of the United States, in such manner as to deny to plaintiff's bankrupt and to all owners of property similarly situated the receipt of just compensation for such taking and the equal protection of the loss to which plaintiff's bankrupt is entitled.

Whether or not plaintiff can establish these claims as a matter of law need not now be decided. Should the plaintiff eventually establish his claim on the merits it might then become necessary to decide whether the plaintiff is without remedy, as he claims, in the state courts under Ohio's laws and controlling decisions. At such a time City of Cleveland v. Carcione, supra, would be considered. Depending upon that conclusion this court could then determine whether it should grant or abstain from granting the relief sought.

The defendant United States of America moves this court to enter summary judgment for defendant United States "on the ground that the pleadings previously filed in this matter, the affidavit filed as part of this motion for summary judgment, and the memorandum in support of the United States' motion for summary judgment show that the defendant is entitled to judgment as a matter of law."

██ Plaintiff, as has been seen, jointly sues the United States of America and the City of Cleveland for $10,000,000. The claim against the United States rests upon the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1964). Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) declares "the purpose of the Federal Tort Claims Act was to waive the government's traditional all-encompassing immunity from tort action and to establish novel and unprecedented governmental liability." The breadth of the Act's purpose is plainly described by Indian Towing Co. v. United States, 350 U.S. 61, 68–69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955):

The broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws.

It is fundamental tort law that negligence is an act or omission in violation of a duty to exercise ordinary care by reason of which injury to person or property occurs. A claim actionable under the Federal Tort Claims Act can be stated within the context of the University-Euclid Urban Renewal Area. At the recent ground breaking ceremonies for new housing at 9300 Hough Avenue, if the Secretary of Health, Education and Welfare had let his shovel fly out of his hands causing injury to a nearby property, the owner could hold the United States liable for the proximate damage. By virtue of the Federal Tort Claims Act the government's sovereign immunity is removed under circumstances in which a private person would owe a duty of ordinary care. The Government thereby becomes responsible for the negligent act of its employee—even a cabinet member.

As each claim of negligence of the United States alleged by the plaintiff is studied it must be asked if it charges violation of any duty imposed on the government to avoid injury or harm to the class of persons—property owners in the University-Euclid Urban Renewal Area —to which class plaintiff's bankrupt belonged.

The several claims of negligence which the plaintiff makes against the United States will not be lumped together in a group. Instead, the claims made individually against the defendant United States and the joint claims against both defendants, some of which appear in the previous summary of plaintiff's complaint, will be considered in the course of the ensuing discussion.

The University-Euclid Urban Renewal Area Project is a product of the Federal Housing Act of 1949, 42 U.S.C. § 1441 et seq. (1964), particularly Subch. 2, §§ 1450 through 1465. An urban renewal fund is created by the act and made available for advances, loans, and grants to local public agencies for urban renewal projects. The role of the federal government is to "provide the necessary financial assistance that will enable local communities to make an effective start to eradicate the slums." H.R.Rep. No. 590, 81st Cong. 1st. Sess. 14 (1949), U. S. Code Cong. Serv. 1949, p. 1550. But as stated in S.Rep. No. 84, 81st Cong. 1st Sess. (1949), U. S. Code Cong. Serv. 1949, p. 1564, "The slum clearance project assisted under the bill would be locally planned and locally executed."

The general scheme and aim of the urban renewal provisions of the Housing Act of 1949 are clear and laudable. Congress recognizes that federal financing is essential to aid cities willing to provide local initiative and funds to undertake projects to check urban blight and to renew slum areas. To accomplish these purposes while protecting the expenditure of federal monies the Act orders the Housing and Home Finance Administrator, before entering an urban renewal contract for loan or capital grant to require the locality to present a "workable program for community improvement * * * for utilizing appropriate private and public resources to eliminate, and prevent the development or spread of, slums and urban blight * * *." 42 U.S.C. § 1451(c) (1964).

The Act permits the administrator to make a "temporary loan or loans to any * * * local public agency to finance the acquisition of * * * real property." The Act also permits the administrator to make capital grants to local public agencies which generally shall not exceed two-thirds of the total cost of the project. Local grants in aid, on the other hand, are generally required to equal at least one-third of the total cost of the project. The loans furnish the immediate monies to allow the local public agency to proceed with land acquisition and other expenses. The capital grants apparently are paid when the project is completed (though advances may be made by the administrator) and are used by the local public agency together with its local grants-in-aid to pay off the federal loans.

Contracts for loans or capital grants shall be made only with a duly authorized local public agency and the contract requirements are enumerated. The urban

renewal plan for the urban renewal area must be approved by the governing body of the locality in which the project is situated and the approval must include findings among which are the need of the financial aid, that the urban renewal plan will afford maximum opportunity for the rehabilitation or redevelopment of the urban renewal area by private enterprise, and that the plan conforms to a general plan for the development of the locality as a whole. The contract must require that there be a feasible method for the temporary relocation of individuals and families displaced from the urban renewal area.

The administrator is empowered to appoint a director to administer the provisions of the subchapter on urban renewal. Among the administrator's powers and duties he may sue and be sued, foreclose on any property or commence any action to protect or enforce any right conferred upon him by any law, contract, or agreement.

Based on the urban renewal law, here outlined, the sufficiency of the plaintiff's principal claims of negligence will be examined. Plaintiff claims that the defendant United States provided careless and inadequate supervision and inspection of the University-Euclid Urban Renewal Area Project and thereby permitted blight and decay to spread throughout the Hough project area. Expanding the claim of inadequate supervision, Paragraph 27 of the complaint states:

Instead of providing for the Hough area project adequate supervision, instead of fulfilling its responsibility to the property owners of the project area to see to it that funds advanced by it were in fact used so as to bring about the renewal and the rehabilitation of the project area in the manner and at the times provided by the renewal plan, the defendant, the United States, carelessly and negligently failed to undertake and to carry out its duties and responsibilities in these respects. Instead, the time and effort which said defendant should have devoted to carrying out such duties and responsibilities was devoted by the United States to the constant preparation and circulation of regulations, orders, directives amendments to regulations, amendments to orders, amendments to directives, modifications and changes of regulations, modifications and changes of orders, modifications and changes of directives, explanations of regulations, explanations of orders, explanations of directives, and the transmittal to its agencies almost daily, at least several times weekly, of the foregoing. In so doing, said defendant regularly and constantly made it more difficult for both of said defendants to execute the Hough area plan in an orderly, careful and proper manner, and placed in the way of such performance almost insurmountable barriers of red tape, all of which directly caused and contributed to cause the damage to the plaintiff described in this complaint.

In carrying out the purposes of the urban renewal law and to protect the expenditure of federal funds, the Administrator has a responsibility to all Americans, including the property owners of the University-Euclid Urban Renewal Project Area, "to see to it that funds advanced by it [United States] were in fact used so as to bring about the renewal and the rehabilitation of the project area in the manner and at the times provided by the renewal plan." But the Administrator owes no unique responsibility to the property owners of the Hough area not owed to all citizens and taxpayers.

The Administrator has the power and the responsibility to make inspections and audits of a project and he may provide "representatives at the site." The necessary expenses of such services, in the form of "fixed fees" are to be paid by the local public agency. But the urban renewal law does not prescribe any specific duty of supervision or inspection by the Administrator, the claimed failure of which inspection can confer a legal right of action upon the owners of property within the urban renewal area.

Plaintiff claims that the execution of the University-Euclid Urban Renewal Project has been impeded by the defendant United States placing "in the way of such performance almost insurmountable barriers of red tape." Plaintiff's counsel in his brief states:

the evidence in this case * * * will involve specific case after specific case in which the plaintiff's bankrupt appealed to and attempted to do business with agencies and employees of the defendant, the United States, and in which such agencies and employees so negligently and improperly handled such applications as to contribute directly to occasioning the damages described.

The property owners in the University-Euclid project area may be justifiably exasperated with bureaucratic red tape which may have slowed the completion of the project. Yet the material point of law remains that the Housing Act of 1949 contains no provision which would make the United States liable in tort because of excessive red tape or because applications of plaintiff's bankrupt to the Housing and Home Finance Administrator or his agency were improperly handled, even assuming that these claims of plaintiff are true.

The loan and capital grant contract relating to the University-Euclid Urban Renewal Area Project was signed by the City of Cleveland and the United States of America on November 15, 1962. Part I consists of 17 pages; it incorporates by reference Part II which contains 47 pages of standard terms and conditions. The contract at numerous points makes it evident that the acquisition of land is solely the responsibility of the local public agency. Section 103 of Part II contains provisions related to supervision and inspections. Under these:

The Government shall have the right to inspect, to the extent deemed necessary by the Administrator, all Project work. The Administrator will inform the Local Public Agency of any non-

compliances, with respect to such work, observed by the Administrator in the course of such inspections, but will not issue any orders or instructions to any contractors or subcontractors on such work. The Local Public Agency will take all steps necessary to assure that, for the purposes of this Contract, the Government is permitted to examine and inspect all project work, and all contracts, materials, equipment, payrolls and employment conditions pertaining to such work, including all relevant data and records.

The limitations of the Government's right of inspection are evident. It has the right of inspection but the correction of any noncompliances must be dealt with through the local public agency. Specifically, the Government is forbidden from issuing any orders or instructions to contractors on the job. Thus, the contract, between the United States Government and the City of Cleveland relating to the University-Euclid Urban Renewal Area Project, while providing for the right of government inspection of the project, was clearly only intended to benefit the Government in fulfilling its duty to see that federal funds are properly spent. This language of the contract imposes no duty of inspection, from which either an owner of property or other private person could derive a private right of action against the Government.

Section 102 of Part II of the urban renewal contract states that:

The Local Public Agency will carry out the Project with all practicable dispatch, in a sound, economical and efficient manner * * *.

Once again this provision is for the benefit of the Government, not any private individual. Section 305 of Part II provides the Government with rights and remedies in event of defaults in payment of principal or interest on loans made to a local public agency. Yet not even this section empowers the Government to employ remedies (such as appointment of a receiver or taking over management of the project) if there is any failure on the

part of a local public agency to "carry out the project with all practicable dispatch."

Hence, neither Section 102 nor any other section of the contract, nor the Housing Act itself contains any provision which upholds or substantiates the plaintiff's claim of negligence "that the defendant United States did not properly plan, supervise and execute the urban renewal project so as to see that the properties in the project area were rapidly acquired by the City of Cleveland after the renewal plan was adopted."

Finally, Section 707 of the contract expressly negatives any possible intent to benefit any third person by reason of the Government's participation in the urban renewal poject.

 Analysis of the University-Euclid Urban Renewal Area contract makes it evident why it is that "The federal courts have consistently held that those not parties to the contract have no standing to enforce conditions imposed on redevelopment agencies by the United States, although those suing would benefit from such enforcement." Johnson v. Redevelopment Agency of City of Oakland, Cal., 317 F.2d 872, at 874 (9th Cir. 1963).

Comparably, Harrison-Halsted Com. Group v. Housing & Home Fin. Agency, 310 F.2d 99, at 104 (7th Cir. 1962) holds that the provisions and regulations of a subsidy application entered into between the Housing and Home Finance Agency and the Chicago Land Clearance Commission did "not confer legal rights upon plaintiffs, as individuals, separate from their position as members of the general public."

 Plaintiff on behalf of his bankrupt, therefore, can claim no duty to it arising under the Housing Act of 1949 or under the loan and capital grant contract between the United States of America and the City of Cleveland as the basis for the tort claims that he now presses against the United States. The position of plaintiff's bankrupt is identical to that of the plaintiff in Mahler v. United States, 306 F.2d 713, at 721 (3rd Cir.

1962). There the Third Circuit Court of Appeals pointed out that:

[I]n enacting the provisions respecting approval and inspection by the federal government, it was not the intention of Congress to impose a duty on the Secretary of Commerce, on the Bureau of Public Roads, or on the United States or any of its agencies, to make sure that a member of the travelling public, a user of a federal-aid highway, was not injured because of negligence in carrying out these provisions. The concern of Congress was to make sure that federal funds were effectively employed and not wasted.

Absent a duty of due care to plaintiff's bankrupt by the United States, owed to the same extent as a private individual under like circumstances, either as a common law duty, or as a duty arising under the Housing Act of 1949 or under the University-Euclid Urban Renewal Area Contract, it is found and determined that the claims of negligence against the United States are legally insufficient.

Defendant United States in support of its motion for summary judgment asks the court to consider several exceptions to the application of the Federal Tort Claims Act, 28 U.S.C. 1346(b) (1964). The complete list of the exceptions appears in 28 U.S.C. § 2680 (1964). Title 28 U.S.C. § 1346(b) (1964) waives sovereign immunity with respect to negligence claims against the United States; and 28 U.S.C. § 2680 (1964) restores the waiver to the types of claims there specified. Thus, Title 28 U.S.C. § 2680(a) (1964) excepts:

Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulations, * * * or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Interpreting the "discretionary" exception the Supreme Court has decided that the United States is not liable for decisions made "at a planning rather than operational level." This explanation of the meaning of "discretionary function or duty" was first declared in Dalehite v. United States, 346 U.S. 15, at 42, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Later, in Indian Towing Co. Inc. v. United States, 350 U.S. 61, at 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Supreme Court in applying 28 U.S.C. § 2680(a) (1964), "the discretionary function or duty" exception, said:

> The question is one of liability for negligence at what this Court has characterized the "operational level" of governmental activity. Dalehite v. United States, 346 U.S. 15, 42, 73 S.Ct. 956.

Concededly, the distinction between the planning and the operational levels of governmental activity is a difficult one. As United States v. Hunsucker, 314 F.2d 98, at 104 n. 11 (9th Cir. 1962) says in a footnote:

> The Supreme Court furnished no criteria as to what is activity at the operational level. From the cases considered, the question would seem to be whether in the light of the facts presented imposition of liability on the government would be consonant with the purposes of the Act.

The claims of negligence against the United States are quite general and indefinite. No act or omission of the United States is identified as to its time or its character. No claim is made that would qualify as operational negligence. This is understandable. The University-Euclid Urban Renewal Area contract makes it evident that the acquisition of land and the entire operation of the project is the function and the responsibility of the City of Cleveland. This allocation of local responsibility is in keeping with the aim and provisions of the urban renewal law.

The core of the plaintiff's claim against the United States is the latter's alleged failure to "see to it that properties in the project area were rapidly acquired by the City of Cleveland after the renewal plan was adopted." It has been seen that neither the urban renewal law nor the University-Euclid Urban Renewal Area contract provides any basis for this claim of negligence. However, even if this claim were legally sufficient it clearly deals with a "discretionary function or duty" under the admonition of Dalehite, supra, that:

> the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Dalehite, supra, 346 U.S. at 35–36, 73 S.Ct. at 968.

██ It is determined that under the pleadings, the Housing Act of 1949, and the urban renewal contract which governs the University-Euclid Urban Renewal Project, the claims of negligence which plaintiff brings against the United States are within the "discretionary function or duty" exception provided by 28 U.S.C. § 2680(a) (1964) and, therefore, not actionable against the United States under the Federal Tort Claims Act.

██ Defendant United States also invokes exceptions in 28 U.S.C. § 2680(h) (1964): "misrepresentation * * * or interference with contract rights." Plaintiff's counsel correctly urges that neither Ohio nor the general tort claims law recognizes a negligent interference with a contractual relationship. Nor is "misrepresentation" a negligent act. There is no claim of any conduct other than negligence in the complaint. Hence, the claimed exceptions of 28 U.S.C. § 2680(h) (1964) are inapplicable to the contentions of plaintiff's amended complaint.

Plaintiff's counsel argues that:

The Motion of the defendant, the United States, For Summary Judgment deals solely with that portion of the

plaintiff's cause of action arising under the Federal Tort Claims Act and based on a cause of action for negligence in the conduct of both defendants. The Motion completely overlooks the allegations of paragraphs 32, 33 and 34 of the Complaint based on a denial of constitutional rights.

In its reply brief, defendant United States points out that any claims for a taking of property by the United States without just compensation is founded upon the Constitution. It is pointed out "The district courts of the United States have jurisdiction to hear claims for taking of property by the United States without just compensation only where the amount sought does not exceed $10,000. For claims in excess of $10,000 jurisdiction lies exclusively in the Court of Claims. 28 U.S.C. 1491(1)."

As pointed out in Myers v. United States, 323 F.2d 580 (9th Cir. 1963), this court does not have jurisdiction of any claim in excess of $10,000 against the United States for a taking of property by the United States without just compensation.

In accordance with the foregoing memorandum it is ordered that:

(1) The motion of the defendant United States for summary judgment is sustained. The complaint is dismissed as to defendant United States.

(2) The motion of the defendant City of Cleveland to dismiss the complaint is denied, considering and treating said complaint as a claim of abuse of eminent domain proceedings by the City of Cleveland, causing the properties of the plaintiff's bankrupt to be taken without just compensation in violation of the fourteenth amendment.

(3) Treating the motion of the City of Cleveland to include and embrace a motion to strike, the plaintiff will be directed to file a second amended complaint in conformity with this memorandum. Included, but not limited to, are specific directions to:

(a) Omit any and all claims relating to or based on a theory of negligence.

(b) Omit any and all claims of loss or deprivation of income of the plaintiff's bankrupt. Incidental or consequential damage of this type is not a permitted element of damage in an action of this type. See R. J. Widen Company v. United States, 357 F.2d 988, 174 Ct. Cl. 1020 (1966).

(c) Omit any and all claims relating to the defendant United States of America.